FILED
2011 Jan-03  AM 11:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| NIHON RUFUTO CO., LTD., | ) | |
| PLAINTIFF, | ) | |
| VS. | ) | 2:09-cv-0041-JHH |
| NIDEK MEDICAL PRODUCTS, INC., | ) | |
| | ) | |
| DEFENDANT. | | |

## MEMORANDUM OF DECISION

The court has before it the September 21, 2010 motion (doc. # 31) of Defendant Nidek Medical Products, Inc. ("Nidek") for summary judgment. Pursuant to the court's September 22, 2010 order (doc. # 33), the motion was deemed submitted, without oral argument, on October 21, 2010. After careful consideration of the briefs and evidence submitted, the motion is due to be granted for the reasons stated below.

## I. Procedural History

Plaintiff Nihon Rufuto Co., Ltd. ("Nihon Rufuto") commenced this action on January 9, 2009 by filing a complaint in this court alleging breach of contract and fraud under Alabama law. Defendant's motion for summary judgment asserts that

both claims fail as a matter of law.  More specifically, Nidek contends that Nihon Rufuto's claim for breach of contract fails because there is no enforceable agreement between the parties and that the claim for fraud is barred by the two year statute of limitations.

Both parties have filed briefs and submitted evidence in support of their respective positions.  Nidek submitted a brief (doc. # 31) and evidence[1] (doc. # 32) in support of its own motion for summary judgment on September 21, 2010.  On October 14, 2010, Nihon Rufuto filed a brief and evidence[2] (doc. # 34 & 35) in opposition to Nidek's motion for summary judgment.  On October 20, 2010, Nidek filed a brief (doc. # 36) in reply to Nihon Rufuto's opposition.  All briefs and evidence have been considered.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together

---

[1]  The defendant submitted the following evidence in support of its motion for summary judgment: deposition of Tadao Ichida; affidavit of Paul Holman with exhibits; May 8, 2002 correspondence signed by Ichida and Chitlangia; Plaintiff's requests for admission and exhibits 8 and 9 attached thereto; August 8, 2005 correspondence prepared by Plaintiff' June 14, 2006 correspondence prepared by Plaintiff; Plaintiff's responses to Defendant's Interrogatories; affidavit of Joe Krawczyk; affidavit of Richard A. Neathammer.

[2]  The plaintiff submitted the following evidence: May 8, 2002 correspondence signed by Ichida and Chitlangia; E-mail from Chitlangia to Ichida regarding OEM Proposal; deposition of Anand Chitlangia.

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  See id. at 323.  Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  See id. at 324.

The substantive law will identify which facts are material and which are irrelevant.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  See id. at 249.

3

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  See Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving

party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  See Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  See Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

**III. Relevant Undisputed Facts**[3]

Plaintiff Nihon Rufuto is a Japanese business that imports and sells medical equipment from America and Europe to Japan.  (Ichida Dep. at 12-13.)   In early 2002, Nihon Rufuto contacted Nidek about the possible development of an oxygen

---

[3] If the facts are in dispute, they are stated in a manner most favor to the non-movant.  See Fitzpatrick, 2 F.3d at 1115.

concentrator for the Japanese market.  (Id. at 20-23.)   On April 19, 2002, Nidek sent a business proposal to Nihon Rufuto that provided a basic outline fo the project scope and business details.  (See Exh. B to Holman Aff.; Ichida Dep. at 26.)   The parties agreed to produce a 3 liter per minute machine that would have an oxygen concentration level of 90 +/-3%.  (See Exh. 1 to Holman Aff.)  The business proposal states that Nihon Rufuto would "coordinate and effect all necessary third party testing and regulatory approvals," and that Nihon Rufuto would provide engineers to work with Nidek to improve system performance. (Id; Hollman Aff. ¶ 7).  All of the initial specifications[4] for the project were contained in the April 2002 business proposal. (Ichida Dep. at 26.)  The parties referred to the project as the "Unity Project."  (See Holman Aff. ¶ 4.)

On or about May 8, 2002, both Tadao Ichida, president of Nihon Rufuto, and Anand Chitlangia, president of Nidek, signed a "condensed project plan and budget . . . for Nidek Medical to undertake the overall project pertaining to the engineering effort leading to production of an OEM concentrator for" Nihon Rufuto. (Def.'s Exh. C.)   The document generally established broad goals for the project which were subject to change as the development progressed.  (Id.)  Specifically, the letter stated

---

[4]  Although the oxygen concentrator level of 90 +/- 3% was not included in the initial proposal, Ichida admitted that this was understood between the parties.  (Ichida Dep. at 35-36.)

that "[u]nder the proposed plan, which is divided into five phases, Nidek Medical

will coordinate the engineering and design effort leading to product realization and

ongoing production, with necessary support from your business and technical staff."

(Id.)  It then outlined the following ten broad categories:

> 1.  Specific agreement with Nihon Rufuto for product specification and product goals.
> 2.  Preparation of quality measures for the product and agreement with Nihon Rufuto.
> 3.  Contracting with an industrial design firm for the purpose of preparing that meets the project goals.  This will include ergonomic, appearance and packing requirements and other elements associated with the product and support as required for test models and prototypes.
> 4.  Contracting the services of a sound Control consultant at the early stages of the product design.
> 5.  Contracting with an electronic design consultant for the purpose of verifying electronic functions and preparation of a printed circuit board that would consolidate all electronic functions including the Oxygen Monitoring System & system alarms.
> 6.  Contracting with a tooling supplier for the preparation of necessary tooling.
> 7.  Preparation of manufacturing processes and procedures in agreement with Nihon Rufuto.
> 8.  Preparation of quality procedures and documents in agreement with Nihon Rufuto.
> 9.  Preparation of suitable manufacturing and assembly area.
> 10.  Support to Nihon Rufuto engineers for the purpose of securing regulatory approvals.[5]

---

[5]  In Japan, the Japanese Ministry of Health must first approve an oxygen concentrator before the product can be offered for sale. (Ichida Dep. at 83-84).

(Id.) (footnote added by the court).  A separate page, following the signatures of both parties, divided the project into four phases and included an itemized $113,000 budget for the project:

PHASE I          COMPONENT REVIEW  & SELECTION
                 COST: $22,5000 PLUS EXPENSES

PHASE II         INDUSTRIAL DESIGN
                 COST: $43,500 PLUS EXPENSES

PHASE III        TOOLING DESIGN
                 COST: $31,000 PLUS EXPENSES

PHASE IV         PRE-PRODUCTION PILOT
                 COST: $16,000 PLUS EXPENSES

(Id.)   The letter further states that "we estimate the total of all expenses to be $220,000[.] This can be reduced if Nihon Rufuto Co.,  Ltd. will require only few pre-production units instead of estimated 100 units."  (Id.)

On or about May 25, 2002, Chitlangia sent Ichida a detailed e-mail regarding the "OEM Proposal."   (Exh. 3 to Holman Aff.)  The e-mail outlined seven steps to be to be taken by the parties in constructing the oxygen concentrator and included dates by which each step should be completed.  (Id.)  The first step asked Ichida to provide Nidek with a "written acceptance of our proposal to you" by the "end of May."  (Id.)  Upon receipt of the written acceptance, Chitlangia stated that Nidek would begin the process of designing and creating the oxygen concentrator, including

8

contracting a design firm, selecting a final design, creating a schematic of the entire machine, constructing prototypes for testing and data collection, and after changes constructing a prototype to be submitted for approval to the Japanese Ministry of Health.  (Id.)  Each step included a date by which it would be completed, and projected "that [if] everything proceeds without any major glitches, we will then be ready to order tooling in September [2002]."  (Id.)  Further, the e-mail asked for a retainer fee of $20,000, a payment of $33,000, representing half of the amount stated in Nidek's proposal for Phases I and II, and the other $33,000, representing the balance of the amount due for Phases I and II.  (Id.)  Ichida signed the email.  (Id.) Between May 2002 and September 2002, Nihon Rufuto paid Nidek $129,350 for work done on the oxygen concentrator.[6]  (Chitlangia Dep. at 111.)

Nidek completed the first prototype at the end of October 2002.  (Holman Aff. ¶ 10.) Nidek presented this prototype to Nihon Rufuto at the Medtrade show in Atlanta, Georgia, on October 29, 2002. (Id.)  Nihon Rufuto was pleased with the prototype, but had a few suggestions for improvement.  (Id.; see Exh. 4 to Holman Aff.)  Therefore, instead of moving the product towards production, throughout the remainder of 2002 and the spring of 2003, Nidek worked on revising the prototype

---

[6] The court assumes that the amount over and above that specifically requested by Nidek represents expenses.

pursuant to Nihon Rufuto's requests.  (Holman Aff. ¶ 11.)

In March 2003, Nidek provided the revised prototype to Nihon Rufuto.  (Id.) After receiving the revised prototype, a representative from Nihon Rufuto responded in an e-mail, stating as follows: "It is impressive and more than that we were expected. Mr. Ichida is also very happy about this workmanship." (Exh. 5 to Holman Aff.)  The e-mail, however, did include two items that Nihon Rufuto wanted changed or revised on the prototype.  (Id.)

Throughout the remainder of 2003, Plaintiff made numerous changes to the project design, including, but not limited to, the addition of a 5 Liter compressor model, an oxygen monitoring system ("OMS") board redesign, constant tweaks to the cabinet design, and many other changes. (Holman Aff. ¶ 12.)  Importantly, the change requested by Nihon Rufuto from a 3 Liter Compressor to a 5 Liter Compressor was very significant and led to many delays in the project.  (Holman Aff. ¶ 13.)  For example, this change required design changes to increase the size of the motor.  (Id.) Additionally, the 5 Liter Compressor generates more heat, more noise and higher wattage; it also has a different capacitor, different sieve beds and the oxygen flow control valve is different than the 3 Liter Compressor.  (Id.)

While making these changes, Nidek continued to work on the 3 Liter Compressor in 2003 as well.  (Holman Aff. ¶ 14.)  In July 2003, Nihon Rufuto

10

inspected both the 3 Liter and the 5 Liter Compressors.  (Id.)  Nihon Rufuto planned to initially submit the 3 Liter Compressor to the Japanese Ministry of Health by January 19, 2004, and then follow with the 5 Liter Compressor. (Id.)

On March 8, 2004, Nidek shipped another prototype to Nihon Rufuto. (Holman Aff. ¶ 15.)  The testing of this 3 Liter prototype demonstrated that it met the requested oxygen purity standards using a 32 stroke compressor, and Nihon Rufuto confirmed that the oxygen concentrator was maintaining 90% purity. (Exhs. 11-13 to Holman Aff.)  Then, on May 24, 2004, Nidek received an e-mail from Nihon Rufuto confirming that all the testing was good and that Nihon Rufuto was going to proceed to get approval from the Japanese Ministry of Health to begin production of the oxygen concentrator.  (Exh. 11 to Holman Aff.)  Throughout the rest of the summer, Nidek and Nihon Rufuto continued to work together, via e-mail, to get the prototype ready.  These e-mails included requests by Nihon Rufuto for lists of parts and materials, pictures of the unit with specific dimensions, as well as changes to the position of the reset button.  (Exh. 13 to Holman Aff.)

In late October 2004, Nidek representatives met with representatives from Nihon Rufuto during the Medtrade show.  (Holman Aff. ¶ 17.)  During that meeting, Nihon Rufuto asked Nidek to incorporate a 2505 BLDC compressor into the Unity Project.  (Id.) The 2505 BLDC compressor, however, was not being manufactured

and sold in the market at that time, so a production model was unavailable for testing. (Id.) Additionally, the 2505 BLDC compressor's motor that ran on DC power, but the compressor initially used by Nidek ran on AC power.  (Id.) Moreover, the DC motor is more expensive than the AC motor.  (Id.)  Paul Holman, the Engineering Project Manager on oxygen concentrators at Nidek, testified that because of these issues the request by Nihon Rufuto was an "unreasonable demand."  (Id.)

In addition, at this meeting, Nihon Rufuto submitted another round of cabinet changes, including a request that the cabinet size be reduced by 5 millimeters on each side. (Holman Aff. ¶ 18.)  Nidek spent many hours making this requested change to the cabinet.  (Id.)  Nidek also spent a great deal of time researching the availability of the 2505 BLDC compressor and necessary adjustments which would be needed if it were incorporated into the Unity Project.  (Id.)

In 2005, Nihon Rufuto requested even more changes to the Unity Project. (Holman Aff. ¶ 19.)  Nidek and Nihon Rufuto representatives met on at least two occasions in 2005, and at both meetings, Nihon Rufuto requested design changes and other modifications.   (Exhs. 15 & 16 to Holman Aff.) For example, one of the changes requested was to reduce the weight of the machine by ten kilograms. (Holman Aff. ¶ 19.)  Holman testified that all the changes "transformed [the Unity Project] into another project altogether."  (Id.)  According to Holman, throughout

12

2006, Nidek continued to make all the requested changes and spent hours doing so, but Nihon Rufuto did not want to pay Nidek any additional money for the implementation of those changes.  (Holman Aff. ¶ 21.)

On August 8, 2005, Ichida sent a letter to Holman and Joe Krawczyk, Vice President of Sales for Nidek.  (Def.'s Exh. E.) The letter was an attempt to "summarize [his] views about the relationship between Nidek and Nihon Rufuto. . . ." (Id.) Ichida began by stating Nihon Rufuto's unhappiness with the status of the project and, although seemingly recognizing that its changes to the project had caused delays, Ichida concluded that "Nidek has not achieved the specifications that we ordered at the first point yet." (Id.) Ichida further stated that Nihon Rufuto did not "intend to pay more extra money," but "requested [Nidek] to build the machine just as we asked." (Id.) Ichida's letter concluded that they "planned the sale of 4,000 to 6,000 machines in 3-4 years with dominant dealer."[7] (Id.) Finally, the letter threatened legal action to recover damages on sales if the project was not completed. (Id.)

Almost one year later, on June 14, 2006,  Ichida sent Nidek a demand letter, seeking $1,720,000.00 in damages. (Def.'s Exh. F.)  In his letter,  Ichida stated in

---

[7]  Ichida further stated that Nihon Rufuto "made a consultant contract with Dr. Suzuki, who is also a family member of the dealer's Hoshi, CEO and we are paying him for every month."  (Def.'s Exh. E.)

pertinent part as follows:

> [Y]our company did not have enough development talent necessary for Unity Project. And your company did not develop it about a part of important specifications. But, your company let you trust us so that there was a development talent and requested unreasonable additional expenses without grounds from our company.

(Id.)  Ichida demanded $1,000,000 in lost profit damages based upon an estimated 2,000 units which would have been sold.[8]  (Id.)  Nihon Rufuto ultimately ordered Nidek to cease working on the Unity Project in 2006. (Ichida Dep. at 230; Holman Aff. ¶ 22.)

## IV. Applicable Substantive Law and Analysis

The complaint contains two counts.  The first count is for breach of contract (doc. #1, Compl. ¶¶ 6-11), and the second count is for fraud (id. ¶¶ 12-23), both under Alabama law.  As to the fraud claim, Nidek argues that it is barred by Alabama's two year statute of limitations, Ala. Code §§ 6-2-3, 6-2-39.  (Doc. # 31 at 20-23.)  Nihon Rufuto does not address this argument in its brief in opposition to summary judgment (see doc. # 34), nor does it address its fraud claim in any fashion in its brief to the court.  As such, Nihon Rufuto has abandoned its fraud claim, and summary judgment

---

[8] Nidek notes that throughout the course of the litigation, Nihon Rufuto has changed its lost profits estimate from $1,000,000 to $3,000,000.  In response to Nidek's Interrogatories, Nihon Rufuto changed estimated sales from 2,000 units to 6,000 units, which tripled the estimated amount of lost profit damages alleged to be suffered.  (See Def.'s Exh. G.)

is due to be entered in favor of Nidek on this claim.  See, e.g., Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned when argument not presented in initial response to motion for summary judgment); Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1326 (11th Cir. 2000) (finding that failure to brief and argue an issue at the district court is sufficient to find the issue has been abandoned); Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) (same).

Therefore, the sole  claim remaining is for breach of contract.  To establish a breach of contract under Alabama law, the plaintiff must establish four elements: (1) the existence of a contract; (2) that plaintiff performed under the contract; (3) that the defendant breached the contract; and (4) that the breach caused damage to the plaintiff.  See McCutchen Co., Inc. v. Media Gen., Inc., 988 So.2d 998 (Ala. 2008). The dispute in this case centers on the first element --  whether there is an enforceable contract between the parties.

Under Alabama law, "[t]o be enforceable, the [essential] terms of a contract must be sufficiently definite and certain." White Sands Group, LLC v. PRS II, LLC, 998 So.2d 1042, 1051 (Ala. 2008) (quoting Brooks v. Hackney, 404 S.E.2d 854, 857 (N.C. 1991)).  A contract that "leav[es] material portions open for future agreement is nugatory and void for indefiniteness."  White Sands Group, LLC, 998 So.2d at

1051(internal quotations and citations omitted). "A lack of definiteness in an agreement may concern the time of performance, the price to be paid, work to be done, property to be transferred, or miscellaneous stipulations in the agreement." 1 Richard A. Lord, Williston on Contracts § 4:21, at 644 (4th ed.2007). "In particular, a reservation in either party of a future unbridled right to determine the nature of the performance . . . has often caused a promise to be too indefinite for enforcement." Id. at 644-48. See also Smith v. Chickamauga Cedar Co., 82 So.2d 200, 202 (Ala. 1955) ("'A reservation to either party to a contract of an unlimited right to determine the nature and extent of his performance, renders his obligation too indefinite for legal enforcement.'") (quoting 12 Am.Jur. Contracts § 66).

"Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain." 17A Am.Jur.2d Contracts § 183 (2004). "The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy." Id.; see also Smith, 82 So.2d at 203. Additionally, for an alleged contract to be considered void based on the indefiniteness of its terms, the "[i]ndefiniteness must reach the point where construction becomes futile." Ex parte Conaway, 767 So.2d 1117, 1119 (Ala. 2000)(internal citations and quotations omitted). "A court will, if possible, interpret

16

doubtful agreements by attaching a sufficiently definite meaning to a bargain if the parties evidently intended to enter into a binding contract." 1 Richard A. Lord, Williston on Contracts § 4:21 (4th ed. 2007); see also Parr v. Godwin, 463 So.2d 129, 132 (Ala. 1984)(holding that "the ambiguity created by the incompleteness is subject to clarification and being made certain by parole evidence" where there was obvious intent to enter into a contract).

Therefore, the dispositive question is whether the parties have "so [definitely] expressed their intentions that the court [can] enforce their agreement?" Beraha v. Baxter Health Care Corp., 956 F.2d 1436, 1440-41 (7th Cir. 1992). It is the plaintiff, Nihon Rufuto, who bears the burden in answering this question. State Farm Fire & Cas. Co. v. Williams, 926 So.2d 1008, 1013 (Ala. 2005); DeVenney v. Hill, 918 So.2d 106, 116 (Ala. 2005). After a careful review of all the evidence, the court answers this question in the negative.

Nihon Rufuto points to two documents as evidence of a contract between the parties: (1) the May 8, 2002 letter from Nidek to Ichida wherein Nidek prepared a condensed project plan and budget for the project involving the production of an OEM Concentrator; and (2) the May 25, 2002 e-mail from Nidek to Nihon Rufuto

which added a proposed time-line to the project.[9]  Neither document, either standing alone or in combination, are definite enough under Alabama law to form a contract for the following reasons.

First, both the letter and e-mail resemble more of a check-list or suggested "to-do" list for the project, than a contract.  They contemplate changes in the future and highlight broad areas that would need to be addressed throughout the duration of the project.  The  May 8, 2002 letter begins by explicitly stating that "[a]lthough, as a result of our meeting, we have basic understanding of your requirements, we are sure that as we progress towards this project, we will have some questions, which may change the scope of our proposal." (Def.'s Exh. C.)  The letter then gives a list of ten broad categories that would need to be completed in order to successfully accomplish the project.  (Id.)

Additionally, there were not any specific dates for beginning or ending the project in the letter.  (See id.)  Nidek, however, points to the e-mail as stating dates certain for completion of different aspects of the project.  (See doc. # 34 at 5-6.)

_____

[9] As pointed out by Nidek, the complaint identifies only the May 8, 2002 letter from Nidek to Ichida as the "contract" upon which it based its breach of contract claim and attached it as Exhibit A to the complaint. (See doc. #1, Compl. Exh. A.)  However, during discovery and more than a year and a half after filing the complaint, Nihon Rufuto began to rely upon the May 25, 2002 e-mail as representing part of the agreement between the parties.  (See Def.'s Exh. D.)  This uncertainty and the changing of positions by Nihon Rufuto as to what document or documents encompass the alleged contract only highlight the indefiniteness of the agreement between the parties.

While it is true that there are dates specified in the e-mail under each step, many of the steps are contingent upon the approval of Nihon Rufuto before moving to the next step, as well as making changes required by Nihon Rufuto. (See Exh. 3 to Holman Aff.)   There is no evidence in the record that these dates were observed by the parties,[10] nor that Nihon Rufuto complained that these dates were not being followed. Even if Nihon Rufuto had complained, the e-mail did not establish or reference any type of penalties, such as fines, if the project did not complete during the time frame referenced by the e-mail.

Although the letter identified a budget, the numbers were clearly a broad estimate, that did not include expenses, and were subject to change. (Id.) ("[t]his [estimate] can be reduced if Nihon Rufuto Co, Ltd will require only few pre-production units instead of estimated 100 units.")   All of these aspects of the letter and e-mail show a "lack of definiteness . . . concerning the time of performance, the price to be paid, [and] work to be done." White Sands Group, LLC, 998 So.2d at 1051 (internal citations and quotations omitted).   Such characteristics render an alleged contract void for indefiniteness under Alabama law. See id.; Parsons &

---

[10] For instance, the e-mail gives a date of July 2002 as the date for the first prototype, but it was not available for inspection until October 2002. (Holman Aff. ¶ 10.)   Additionally, instead of having all the changes to Nidek by August 2002, Nihon Rufuto continued to request changes through 2005. (See Holman Aff. ¶¶ 12-19.)

Whitemore Enter.'s Corp., 615 F. Supp. 2d at 1301-02.

More importantly, Nihon Rufuto had an unbridled right of discretion in deciding when or whether Nidek fully performed under the OEM proposal. Both the letter and e-mail anticipated changes in the design of the project and specifically detail areas that would not be completed until Nidek received approval from Nihon Rufuto. In fact, the letter and e-mail give Nihon Rufuto final authority in all decisions regarding the project. The record is replete with examples of Nihon Rufuto making substantive changes to the oxygen concentrator that completely changed the scope of the project as it was originally articulated in the May letter and e-mail. (See Holman Aff. ¶¶ 12-22.) Such an unrestricted right to determine future performance is evidence that the parties lacked a clear agreement as to the project, including what actions constituted performance and what actions would give rise to a breach of the agreement. Under Alabama law, the letter and e-mail do not amount to a contract, and the agreement between the parties is void as indefinite. See Parsons, 615 F. Supp. 2d at 1302; White Sands Group, LLC, 998 So. 2d at 1051; Smith, 82 So.2d at 202.

Finally, Nihon Rufuto's argument that the letters are ambiguous and, therefore, should be construed against Nidek as the drafter of the letters (see doc. #34 at 5) is to no avail. Nidek is not arguing that the letters are ambiguous. In fact, Nidek

argues that the letters are quite clear in that they are not reasonably certain and are not legally sufficient to form a contract under Alabama law.

In summary, the alleged agreements in this case are void for indefiniteness. Not only do they fail to identify what acts constitute a breach, what damages are available for any such breach, or a specific time frame for performance, but the actions of the parties, specifically Nihon Rufuto's continuing material changes in the project, highlight the indefinite nature of the loose agreements between the parties. As such, a claim for breach of contract cannot stand under Alabama law.[11] See White Sands Group, LLC, 998 So.2d at 1051.

## V.  Conclusion

The court finds that no material issues of fact remain and that Defendant Nidek Medical Products, Inc. is entitled to judgment as a matter of law as to all claims asserted by Plaintiff Nihon Rufuto Company, Ltd..  A separate order will be entered.

DONE this the 3rd day of January, 2011.

_James H. Hancock_

SENIOR UNITED STATES DISTRICT JUDGE

---

[11]  Because of the decision of the court regarding the breach of contract claim, the court does not address the argument of the parties regarding lost profits.

21